Adela Gaztambide Vda. de Arrillaga y otros, demandantes y
apelantes, *v.* Sucesión de Juan Ortiz Pericchi, etc., y
Herminio Flores Rodríguez y Aurelio Tió Nazario, de-
mandados y apelados.

Núm. 9541.—*Sometido:* Febrero 4, 1949. *Resuelto:* Julio 29, 1949.

*Francisco A. Arrillaga, pro se* y además por sus abogados *Antonio Riera, A. Rivas Rosario, Raúl Trujillo Santiago, Alberto Ferrer, Ramón Gandía Biscombe* y *Alberto Picó Santiago; Pedro E. Anglade,* abogado de los demás apelantes; *Fernando B. Fornaris* y *Pablo Juan Toro,* abogados de la Sucesión Pericchi, apelada; *José A. Poventud* y *Enrique Báez García,* abogados del apelado Tió Nazario; *Amador Ramírez Silva,* abogado del apelado Flores Rodríguez.

EL JUEZ PRESIDENTE SEÑOR DE JESÚS emitió la opinión del tribunal.

En este caso se trata de la revisión de una sentencia sumaria. La demanda enmendada puede resumirse así: Los demandantes son los únicos herederos de Rafael Arrillaga Urrutia, quien falleció el 15 de septiembre de 1933 hallándose casado en únicas nupcias con la codemandante Adela Gaztambide. Los demandados, con excepción de Herminio Flores Rodríguez y Aurelio Tió Nazario, son los únicos y universales herederos de Juan Ortiz Pericchi. A Rafael Arrillaga Urrutia pertenecía privativamente cierta finca denominada Hacienda Monserrate compuesta de 142.96 cuerdas que se describe en la demanda, y la sociedad de gananciales que surgió con motivo de su matrimonio con Adela Gaztambide era dueña de cuatro fincas rústicas de 15, 7, 52.24 y 10.45 cuerdas, respectivamente, las cuales colindaban entre sí y con la finca de 142.96 cuerdas.

Por escritura número 26 de 17 de febrero de 1929 otorgada en San Germán ante el notario Miguel A. García Méndez, inscrita en el Registro de la Propiedad de Mayagüez, los esposos Arrillaga Gaztambide agruparon las cinco fincas, es decir, la de carácter privativo y las cuatro pertenecientes a la sociedad de gananciales, formando así una de 227.65 cuerdas que se describe en la demanda. Por la misma escritura la hipotecaron a favor de Juan Ortiz Pericchi en garantía de un préstamo por la cantidad de $7,000 de capital, sus intereses estipulados a razón de diez por ciento anual para lo cual se señaló un crédito adicional de $2,800, y dos más de $500

y $200 para intereses en caso de mora y para costas, gastos y honorarios de abogado, respectivamente. De acuerdo con los términos de la escritura, la hipoteca debería vencer el 17 de febrero de 1933 y no habiendo los deudores hipotecantes satisfecho dos plazos de intereses,[1] el 12 de agosto de 1932 Juan Ortiz Pericchi instó el procedimiento sumario que estatuye la Ley Hipotecaria y su Reglamento alegándose en el escrito inicial, entre otros hechos, los siguientes:

"Que por la cláusula CUARTA de la ameritada escritura se convino entre las partes que si al vencimiento de uno cualquiera de los plazos de intereses o del plazo de capital de éste no fuere satisfecho, el mismo continuará devengando intereses moratorios a razón del mismo diez por ciento anual, liquidados dichos intereses anualmente, pero sin que esta concesión pueda interpretarse como motivo de prórroga."

Dictada el 12 de agosto de 1932 la orden de requerimiento de pago, el secretario expidió el correspondiente mandamiento al márshal para que requiriera a Rafael Arrillaga Urrutia y a su esposa Adela Gaztambide para que pagaran al demandante en aquel procedimiento las siguientes cantidades: plazo vencido el 17 de febrero de 1931 y no satisfecho: $700; intereses moratorios al diez por ciento anual sobre dicho plazo de intereses vencidos y no satisfechos computados desde el 17 de febrero de 1931 hasta el 17 de febrero de 1932: $70; plazo de intereses vencido el 17 de febrero de 1932 y no satisfecho: $700; total de capital, $7,000, el cual, sumados los intereses, asciende a $8,470. Intereses moratorios al 10 por ciento anual sobre $8,470 computados desde el 17 de febrero de 1932 hasta la liquidación: $385.85. Total: $8,855.85, más los intereses al diez por ciento anual sobre $8,855.85 hasta el pago total del crédito, más las costas, gastos y honorarios de abogado. En

[1] Resulta de los autos, aunque no de la demanda, que en la escritura de hipoteca expresamente se convino que "vencido uno cualquiera de los plazos de intereses y no satisfecho el mismo, se entenderá vencida la hipoteca en su totalidad y podrá el acreedor proceder al cobro total de la deuda por la vía judicial como si la hipoteca hubiese llegado a su término".

cumplimiento del referido mandamiento, el 12 de agosto de 1932, el submárshal Luis Soler se personó en la residencia de los esposos Arrillaga Gaztambide y entregó copia del escrito inicial y del mandamiento a Adela Gaztambide, dejándole una copia para su esposo, sin que éste estuviera presente en aquella ocasión.

Continúa alegándose en la demanda que el procedimiento hipotecario sumario es nulo por las siguientes razones adicionales:

(*a*) Porque perteneciendo a dos entidades distintas las fincas que se intentaron agrupar, la agrupación es ineficaz en derecho y la finca resultante de la agrupación carece de existencia legal;

(*b*) Porque no teniendo existencia legal la finca agrupada, no podía ser hipotecada, y de considerarse la transacción como una hipoteca de los distintos inmuebles que se intentaron agrupar, la escritura de hipoteca no era inscribible, toda vez que no se distribuyó la responsabilidad hipotecaria entre las distintas fincas, y a lo sumo la deuda reconocida por Rafael Arrillaga y su esposa es una deuda personal para el cobro de la cual no procede el procedimiento ejecutivo hipotecario;

(*c*) Porque en el supuesto de que se resolviera que podía instarse el procedimiento ejecutivo hipotecario, éste, la orden, el mandamiento y el requerimiento de pago fueron dictados sin jurisdicción porque la garantía hipotecaria para intereses de mora sólo alcanza a la cantidad de $500 y el requerimiento de pago exigía para intereses una cantidad en exceso de dichos $500, como ya hemos indicado;

(*d*) Porque no aparece que los edictos fueron expuestos al público en el pueblo de Añasco donde están localizados los bienes inmuebles objeto del procedimiento;

(*e*) Porque se convino en la escritura de hipoteca que si al vencimiento de cualquiera de los plazos de intereses o del

plazo del capital,(¹ᵃ) éste no fuera satisfecho, el mismo continuará devengando intereses a razón del diez por ciento anual, liquidados dichos intereses anualmente, y del escrito inicial aparece la siguiente alegación:

"6. Manifiesta el ejecutante Don Juan Ortiz Pericchi, que del crédito hipotecario anteriormente relacionado solamente le han satisfecho el plazo de intereses que venció en 17 de febrero de 1930, y que ni los demandados ni persona alguna le han satisfecho los plazos de intereses vencidos en 17 de febrero de 1931 y 17 de febrero de 1932, por lo que la hipoteca está vencida en su totalidad y es ejecutable, siendo la liquidación del crédito el día primero de agosto de 1932, la siguiente:" (Sigue la liquidación arrojando un total de $8,855.85.)

(f) Porque surge de dicha liquidación que habiéndose liquidado el plazo de intereses vencidos el 17 de febrero de 1932, no podían los demandados liquidar los intereses en agosto 1, 1932 a los efectos de cargar intereses sobre dichos intereses, ya que para agosto 1, 1932 no había transcurrido una anualidad a contar de febrero 17, 1932 y, por lo tanto, el cobro de dichos intereses y la orden de requerimiento de pago expedida para cubrir dichos intereses moratorios a partir de febrero 17, 1932, fué dictada sin que la corte tuviera jurisdicción para ello;

(g) Porque en el escrito inicial presentado no hay alegación de clase alguna de que los plazos de intereses y capital tenían que ser satisfechos en sitio alguno, por lo que dichos pagos tenían que hacerse en el lugar del domicilio del deudor y de dicho escrito inicial no aparece que el acreedor, tanto en persona o por mandatario, se personara en el lugar del domicilio del deudor para recibir el pago de dichos plazos de intereses al vencimiento de éstos, o que gestionara en el domicilio del deudor el pago de los intereses correspondientes;

(h) Porque no obstante conocer Juan Ortiz Pericchi la falsedad que se consignó en el escrito inicial al reclamar in-

---

(¹ᵃ) El capital no era pagadero a plazos. De acuerdo con la certificación del Registrador el préstamo debería devolverse cinco años después de otorgada la escritura.

tereses que no habían sido convenidos y que no aparecían garantizados hipotecariamente, y a sabiendas de que la supuesta agrupación de bienes inmuebles carecía de validez y eficacia, permitió que los procedimientos de dicha ejecución de hipoteca continuaran hasta que el 3 de noviembre de 1932, y a virtud de los procedimientos indicados, se vendió a través del márshal el inmueble que se intentó agrupar y en la subasta compareció como único postor Juan Ortiz Pericchi, quien adquirió el referido inmueble disfrutándolo hasta que el 25 de agosto de 1933, ante el notario José Martín Betancourt, vendió el mismo a los codemandados Aurelio Tió Nazario y Herminio Flores Rodríguez, de por mitad, habiendo posteriormente, es decir, en septiembre 20 de 1940, Herminio Flores Rodríguez y su esposa vendido su condominio a Aurelio Tió Nazario, por escritura número 5 ante el notario Miguel A. García Méndez, y que desde entonces continúa poseyendo el referido inmueble.

Continúa alegándose que del asiento practicado en el Registro de la Propiedad relacionado con la intentada agrupación de los inmuebles descritos precedentemente, surgen los hechos que aparecen relacionados en la misma, por lo que eran de conocimiento de Herminio Flores Rodríguez y de Aurelio Tió Nazario, y que del propio Registro resultaba que el título de Juan Ortiz Pericchi procedía de una venta judicial resultante del procedimiento hipotecario ya relacionado, estando dicho título sujeto a ser atacado en la acción plenaria correspondiente. Finalmente alegan los demandantes que las referidas fincas han sido dedicadas por los demandados y su causante al cultivo de cañas de azúcar y otros productos agrícolas, y que el valor en el mercado de dichos frutos percibidos o podidos percibir, desde noviembre 3, 1932 en que fueron privados los demandantes de la posesión de los inmuebles referidos, incluyendo los pagos de compensación como consecuencia del Programa de Ajuste Agrícola y del *Bill* Costigan–Jones, luego de deducidos los gastos de cultivo y producción, ascienden a $300,000. Termina la demanda con

súplica de una sentencia de conformidad con sus alegaciones.

Contra esta demanda radicaron los demandados, el 22 de octubre de 1945, mociones para desestimar, para eliminar extremos de la misma y para que se hiciera una exposición más definida de los hechos. Estando pendientes estas mociones, el 18 de febrero de 1946 los demandados, sin perjuicio de las mismas, radicaron una solicitud de sentencia sumaria. En esta solicitud combinaron la moción solicitando sentencia sumaria con la de desestimar que antes habían presentado.(²) En la moción sobre sentencia sumaria pidieron los demandados que se declarase sin lugar la demanda imponiendo costas y honorarios a los demandantes: (1) porque los hechos expuestos en la demanda no autorizan remedio alguno a favor de la parte actora; (2) porque además de estar impedidas las pretendidas causas sobre nulidad de la agrupación y de los contratos de hipoteca y venta judicial, estas dos últimas supuestas acciones no surgieron dentro de cuatro años, ni la primera dentro de los quince anteriores a la radicación de la demanda; (3) porque los codemandados Aurelio Tió Nazario y Herminio Flores Rodríguez, como adquirentes de quien tenía inscrito su título sin defecto alguno, son terceros; (4) porque ha prescrito a favor del codemandado Aurelio Tió Nazario el dominio del inmueble que se pretende reivindicar por haberlo poseído ininterrumpidamente como dueño, con justo título inscrito de buena fe, durante más de diez años; (5) por los demás motivos resultantes del récord, especialmente de la propia demanda enmendada, de las mociones consolidadas para desestimar y de la certificación del Registrador de la Propiedad de Mayagüez, fechada el 1ro. de febrero de 1946.

En apoyo de la solicitud de sentencia sumaria, los demandados no radicaron *affidavits* ni deposiciones, pero de la cer-

---

(²)La moción sobre sentencia sumaria que autoriza la Regla 56(*b*) de las de Enjuiciamiento Civil, puede consolidarse con la moción para desestimar. *Palmer* v. *Palmer*, 31 F. Supp. 861 (D. Conn., per Clark, C.J.); *Commentary, Motion For Summary Judgment Before Answer*, 4 Fed. Rules Serv. 56a.3.

tificación del Registrador a que se ha hecho referencia constan: (a) la inscripción de la finca agrupada y la constitución de hipoteca a favor de Juan Ortiz Pericchi; (b) la inscripción cuarta de la misma finca por la cual se inscribió ésta a favor de Juan Ortiz Pericchi a virtud de la venta en pública subasta en el procedimiento sumario; (c) la inscripción sexta por la cual se inscribió la misma finca a favor de Herminio Flores Rodríguez y de Aurelio Tió Nazario por compra a Juan Ortiz Pericchi, y la hipoteca constituída por éstos sobre la misma finca a favor del vendedor en garantía del precio aplazado, siendo más tarde cancelada la hipoteca; y de la inscripción novena por la cual se inscribió la compra que del condominio de Herminio Flores Rodríguez hiciera Aurelio Tió Nazario.

██ Para concluir que la demanda aduce hechos constitutivos de causa de acción sólo bastará considerar que, de acuerdo con sus alegaciones, la finca de 142.96 cuerdas conocida por Hacienda Monserrate, pertenecía privativamente a Rafael Arrillaga Urrutia y que correspondiendo las cuatro fincas restantes a la sociedad de gananciales constituída entre Arrillaga y su esposa Adela Gaztambide, dichas fincas no podían agruparse, de conformidad con el artículo 61 del Reglamento Para la Ejecución de la Ley Hipotecaria.(³) Explicando este artículo dice el Profesor Luis Muñoz Morales en su obra Lecciones de Derecho Hipotecario, página 142:

". . . También puede el dueño de varias fincas separadas e inscritas bajo números distintos, reunirlas en un solo cuerpo que sumará la totalidad de la cabida para inscribirse como una nueva finca bajo

---

(³)El artículo 61 del Reglamento Para la Ejecución de la Ley Hipotecaria, en lo pertinente, prescribe:

"Artículo 61.—Se inscribirán bajo un solo número si los interesados lo solicitaren, considerándose como una sola finca, con arreglo al artículo 8 de la ley y para los efectos que el mismo expresa:

" * * * * * *

"Cuarto. Las piezas de tierra colindantes que pertenezcan *a un mismo dueño,* o a varios *pro indiviso,* aunque no tengan albergue alguno ni sean de idéntica procedencia u origen, y hayan llegado al último adquirente por diversos títulos." (Bastardillas nuestras.)

número distinto; y esto es lo que se denomina agrupación, debiendo observarse que las parcelas agrupadas deben pertenecer al mismo dueño. También puede separarse parte de una finca inscrita para unirla a otra igualmente inscrita.''

Y en *Vargas* v. *Registrador,* 38 D.P.R. 237, esta Corte dijo por su Juez Asociado Sr. Texidor:

"Este Tribunal ha sostenido, en su integridad, el principio que aparece del artículo 61 antes citado. En los casos *Muñoz* v. *Registrador,* 25 D.P.R. 842 y *Vilá* v. *Registrador,* 27 D.P.R. 929, que cita el registrador en su nota, y que son de estricta aplicación al caso presente, se ha mantenido la doctrina de la imposibilidad legal de hacer agrupaciones de bienes privativos y bienes gananciales.'' (pág. 239.)

Es verdad que en *Vilá* v. *El Registrador de San Juan, Sección Primera,* 27 D.P.R. 929, marido y mujer agruparon bienes que pertenecían, unos privativamente a uno de los esposos, y otros a la sociedad de gananciales, y por la misma escritura vendieron las fincas así agrupadas. El comprador presentó en el Registro la escritura y al revocar la nota que denegó su inscripción por el fundamento de que la agrupación no podría legalmente hacerse, dijimos que como las fincas habían sido vendidas en el mismo acto y el comprador se había convertido en dueño de ellas, al presentar su título en el Registro, teníamos al solo dueño que requiere el artículo 61 del Reglamento, quien como tal, podía solicitar que en vez de inscribirlas separadamente, se inscribieran agrupadas. Posteriormente, en *Surís* v. *Registrador,* 55 D.P.R. 540, en que se trataba de una agrupación de bienes gananciales con bienes privativos y de una hipoteca de la finca resultante de la agrupación, tuvimos oportunidad de distinguir el caso de *Vilá* v. *El Registrador de San Juan,* supra, de esta manera:

"En los casos citados por el recurrente, los cónyuges vendedores agruparon fincas de la sociedad de gananciales con otras privativas de uno de ellos y hecha la agrupación, en el mismo acto vendieron la finca así agrupada. Tratándose de que el comprador adquiría el dominio pleno tanto de las fincas de la sociedad de gananciales como

de las privativas del cónyuge, la agrupación era inscribible, pues de todos modos el comprador, al adquirir las fincas, tenía el derecho indiscutible de agruparlas. Habiéndolas agrupado los vendedores con el consentimiento del comprador, puesto que de no estar éste conforme con la agrupación no hubiese aceptado la venta y firmado la escritura, equivale a haberse practicado la agrupación por el propio comprador. *Qui facit per alium facit ·per se.* El caso que nos ocupa es distinto. Aquí no se trata de un comprador, sino de un acreedor hipotecario el cual adquiere un derecho real sobre los inmuebles hipotecados, pero no el dominio de los mismos. No teniendo el recurrente el dominio de las fincas hipotecadas, no es dueño de ellas, y no siendo dueño carece de la condición primordial para poder llevar a cabo una agrupación, cual es ser dueño de las fincas agrupadas. Artículo 61 del Reglamento para la Ejecución de la Ley Hipotecaria. El acreedor hipotecario no tiene derecho alguno, como no lo tiene el arrendatario, a agrupar fincas que no le pertenecen. Por esa razón no puede considerarse que la agrupación la verifica el acreedor hipotecario, como pretende equivocadamente el recurrente. Si no puede inscribirse la agrupación, tampoco puede inscribirse la hipoteca sobre la finca agrupada, ya que no puede constituirse una hipoteca sobre una finca que ni siquiera tiene existencia legal, como sucede en este caso.'' (págs. 541, 542.)

 En tales circunstancias, el supuesto contrato de hipoteca no era inscribible, y siendo ello así, la hipoteca fué inexistente, de conformidad con los artículos 1774 del Código Civil y 146 de la Ley Hipotecaria.(⁴) S. no hubo la hipoteca, precisa concluir que el procedimiento sumario para ejecutarla fué una absoluta nulidad.

Parecerá extraño que hagamos caso omiso de las alegaciones de la demanda al efecto de que Rafael Arrillaga Urrutia no fué notificado personalmente del requerimiento de

---

(⁴)El artículo 1774 del Código Civil, en lo pertinente, prescribe:
''Además de los requisitos exigidos en el artículo 1756, es indispensable, para que la hipoteca quede válidamente constituída, que el documento en que se constituya sea inscrito en el registro de la propiedad.''
El artículo 146 de la Ley Hipotecaria prescribe:
''Para que las hipotecas voluntarias queden válidamente constituídas, se requiere:
''1. Que se hayan convenido o mandado constituir en escritura pública.
''2. Que la escritura se haya inscrito en el Registro que se establece por esta ley.''

pago en el procedimiento sumario. Esto se debe a que en la certificación del Registro se transcribe el requerimiento de pago y del diligenciamiento del mismo resulta que dicho demandado en el procedimiento ejecutivo fué requerido personalmente en su residencia.

■ Tampoco discutimos el otro alegado motivo de nulidad consistente en haber cobrado intereses de mora a partir del 17 de febrero de 1932 hasta el 1ro. de agosto de 1932, porque conforme resulta de la certificación del Registrador, en el contrato de hipoteca se estipuló que vencido un plazo de intereses, se entendería vencida toda la deuda. Así, pues, no puede alegarse que ese plazo no estaba vencido por el hecho de que no hubiera expirado su término natural.

■ Los defectos anteriormente apuntados en relación con la agrupación de las fincas y la constitución de la hipoteca, constaban del Registro, puesto que todas las fincas se hallaban inscritas. Un examen del Registro en relación con cada una de ellas claramente hubiera demostrado el carácter privativo de una y el ganancial de las otras. En tal virtud, tanto Ortiz Pericchi como Aurelio Tió Nazario y Herminio Flores Rodríguez, no tienen la condición de terceros de acuerdo con el artículo 34 de la Ley Hipotecaria, toda vez que la inexistencia de la agrupación, así como de la hipoteca que se pretendió constituir, claramente aparecía del Registro. Y en lo que respecta a los herederos de Ortiz Pericchi claro es que, independientemente del Registro, son responsables de las obligaciones de su causante. Artículo 610 del Código Civil.

■ Establecido que la demanda enmendada aduce hechos constitutivos de causa de acción contra todos los demandados, réstanos determinar ahora si erró la corte a quo al dictar la sentencia sumaria que la declaró sin lugar.

La Regla 56(*b*) de las de Enjuiciamiento Civil dispone:

"*A Favor de la Parte que Defiende.*—Una parte contra la cual se haya formulado una reclamación, reconvención o reclamación recíproca, o contra la cual se solicite una sentencia declaratoria, podrá,

en cualquier momento, presentar una moción, *basada o no* en *affidavits*, para que se dicte sentencia sumariamente a su favor sobre la totalidad o cualquier parte de la misma.'' (Bastardillas nuestras.)

El propósito de la Regla 56 es acelerar el procedimiento de aquellos pleitos en que realmente no existe una controversia genuina de hecho a ser juzgada. Persiguiendo ese fin, los demandados, al radicar su moción sobre sentencia sumaria, hicieron parte de la misma la aludida certificación del Registro con el fin de destruir la alegación esencial de la demanda relacionada con la nulidad de la agrupación y de la hipoteca por el defecto de no pertenecer todas las fincas a un mismo dueño. Pero esa certificación no destruyó la alegación esencial de la demanda. Esto es así porque la certificación se contrae exclusivamente a los asientos de inscripción de la supuesta agrupación y a posteriores inscripciones de la finca supuestamente agrupada, y no resulta claramente de esa certificación que todas las fincas pertenecieran a la sociedad de gananciales como pretenden los demandados. La certificación, luego de referirse al número de orden y cabida de cada una de las fincas, dice: ''. . . inscritas la primera [Hacienda Monserrate] en concepto de posesión y las otras cuatro en concepto de dominio a favor de Rafael Arrillaga Urrutia, mayor de edad, casado con Adela Gaztambide, abogado y vecino de Añasco, a los folios . . . .''.

Concedemos que esa inscripción no revela que la Hacienda Monserrate tuviera carácter privativo. Pero no era en esa inscripción donde los que alegan su condición de terceros tenían que buscar el carácter privativo o ganancial de la referida finca, sino en la inscripción décima que aparece en el folio 99 del tomo 8 de Añasco, por la cual Arrillaga inscribió a su favor la posesión de la misma. Ese era el medio por el cual los demandados podían probar que no existía—por lo menos en cuanto a ese hecho esencial respecta

—una controversia genuina de hecho a ser juzgada. Quien alegue la condición de tercero hipotecario viene obligado a examinar todo el historial de la finca en el Registro y no puede ampararse alegando que en determinado asiento de inscripción no aparece claramente el defecto que le impida alegar tal condición.

En *Ramos* v. *Pueblo,* 67 D.P.R. 640, hemos resuelto que quien solicita la sentencia sumaria viene obligado a demostrar que no hay controversia genuina de hecho a ser juzgada. Y es el deber del juez sentenciador determinar si existe una controversia de hecho sustancial. Si la hay, debe dirimirse en el juicio correspondiente. *Associated Press* v. *United States,* 326 U. S. 1 (1945). En este caso no cabe duda que existe una controversia de un hecho esencial que debe ser juzgada por la corte. Pero los demandados alegan que los demandantes debieron presentar *contraaffidavits* para destruir el efecto de la certificación del Registro. De igual modo los demandantes alegan que los demandados debieron presentar affidavits en apoyo de su solicitud de sentencia sumaria. Los demandantes no venían obligados a presentar contraaffidavits, pues como hemos visto, la certificación del Registrador no destruyó la alegación esencial de la demanda, y por consiguiente, podían ellos descansar en la misma. Tampoco venían obligados los demandados a acompañar affidavits a la certificación, ya que la Regla 56 dispone que la sentencia sumaria puede solicitarse *con o sin affidavits o deposiciones.*

Alegan los demandados que la acción está prescrita. Ya hemos visto que de acuerdo con las alegaciones de la demanda, tanto la agrupación como la hipoteca son inexistentes. La prescripción no corre contra lo inexistente. El decurso del tiempo no puede insuflar vida a lo que legalmente nunca la tuvo. Por consiguiente, un procedimiento en cobro de una hipoteca inexistente no puede tener existencia legal y la prescripción no corre contra el mismo. *Costas*

v. *G. Llinás & Co.*, 66 D.P.R. 730. Podrá aparecer, como arguyen los demandados, que la anulación del procedimiento ejecutivo descansa en un mero tecnicismo al fundamentar la nulidad en el hecho de haber agrupado indebidamente las fincas. Pero no hay tal tecnicismo. Si tratásemos de considerar las fincas como separadamente hipotecadas, prescindiendo así de la agrupación, nos confrontaríamos con la dificultad insuperable de que no tendríamos base para fijar la parte del crédito hipotecario de que cada finca debería responder. En tales circunstancias, un procedimiento ejecutivo contra varias fincas cuya responsabilidad no ha sido fijada, sería nulo porque de haberse constituído originalmente la hipoteca en esa forma, el contrato no era inscribible. Artículo 119 de la Ley Hipotecaria. *Ortiz* v. *El Registrador de la Propiedad*, 16 D.P.R. 676 y *J. M. Portela & Co.* v. *Registrador*, 41 D.P.R. 281. No siéndolo, no podría interponerse el procedimiento ejecutivo para su cobro.

Arguyen también los demandados que los demandantes están impedidos por los actos de su causante de alegar la nulidad del procedimiento ejecutivo. Fundan su contención en que al comparecer ellos en la escritura de agrupación e hipoteca y al agrupar las fincas, los indujeron a creer que todas ellas pertenecían a la sociedad de gananciales. Este argumento carece de méritos, pues las fincas estaban todas inscritas en el Registro de la Propiedad, y siendo éste un registro público al alcance tanto de los deudores hipotecantes como del acreedor hipotecario, pudieron haber descubierto ellos el error en que se incurrió al hacer tal agrupación. Pero aparte de esto, de acuerdo con los principios de Derecho Hipotecario, se presume concluyentemente que el acreedor hipotecario conocía las constancias del Registro, y apareciendo del mismo el carácter privativo de la Hacienda Monserrate y el ganancial de las cuatro fincas restantes, no puede alegarse con éxito que él o sus causahabientes hubieran sido inducidos a error por el acto de los deudores hipotecan-

tes. Parece aplicable, por analogía, el siguiente comentario de Manresa al artículo 1483 del Código Civil Español, igual al 1372 del nuestro:

"Dice el Código, que 'si la finca vendida estuviese gravada, sin mencionarlo la escritura, con alguna carga o servidumbre no aparente, de tal naturaleza que deba presumirse no la habría adquirido el comprador si la hubiera conocido, podrá pedir la rescisión del contrato, a no ser que prefiera la indemnización correspondiente.' Y añade el aludido escritor explicando el precepto: se comprende que las servidumbres aparentes no produzcan el mismo efecto, puesto que su existencia y ejercicio se revela por signos que las hacen públicamente conocidas; pero si el gravamen o la servidumbre no aparente estuviesen inscritos en el Registro de la Propiedad, el comprador pudo conocer perfectamente el estado del inmueble vendido; y si sufre perjuicio, debe imputárselo, no sólo al vendedor, sino a él mismo. ¿Podrá, no obstante, pedir la rescisión del contrato, o la indemnización?

"No contesta dicho escritor a esta pregunta, limitándose a formularla; pero entendemos nosotros que en el caso propuesto no tendrá derecho el comprador, ni a la rescisión del contrato ni a pedir indemnización de ninguna especie. La razón en que nos fundamos nos parece bastante clara: el artículo 1537 dice: 'Todo lo dispuesto en este título se entiende con sujeción a lo que respecto de bienes inmuebles se determina en la Ley Hipotecaria.' El título a que se refiere dicho artículo, es el que trata de la compra y venta, en el cual está comprendido el artículo que comentamos; luego es evidente que su precepto debe entenderse subordinado a las disposiciones de la Ley Hipotecaria. Ahora bien; una de las bases fundamentales de esta Ley es el principio que se consigna en el artículo 24 de la misma, que dice que los títulos inscritos surtirán su efecto aun contra los acreedores singularmente privilegiados por la legislación común; luego si esas cargas o servidumbres están inscritas en el Registro, es visto que deben producir su efecto contra el comprador de la finca que a esos gravámenes está sujeta, y ese efecto no puede ser otro, en el caso propuesto, que privarle de las acciones que le concede el artículo 1483 del Código, que sin duda le asistirían si no hubiera inscripción." Manresa, Comentarios al Código Civil Español, t. 10 (2da. ed. 1908) págs. 221, 222.

Los demandados invocan el caso de *Veve y Díaz* v. *Sánchez*, 226 U. S. 234 (1912). Ese caso es fácilmente distin-

guible del presente. Allí los demandantes hipotecaron a la demandada María Díaz cierta finca denominada Bello Sitio, la cual se decía constar de 400 cuerdas y se describían sus linderos o colindancias. La finca fué ejecutada en el año 1889 antes de entrar en vigor la actual Ley Hipotecaria, y María Díaz la compró en la subasta y fué puesta en su posesión. Resultó que en el centro de la finca Bello Sitio había una parcela de terreno denominada Saurí que constaba de 134 cuerdas. Esta parcela de terreno denominada Saurí no pertenecía a José Avalo Sánchez cuando se constituyó la hipoteca, pero la poseía en arrendamiento, y la adquirió por compra tres semanas después. Avalo Sánchez no advirtió a la acreedora hipotecaria que aquella parcela de terreno que aparentemente era parte de la finca Bello Sitio no fuera suya, ni podía ella sospechar que dentro de los linderos de Bello Sitio existiese una finca independiente de esta última. Después de ejecutada la hipoteca y puesta la finca Bello Sitio, incluyendo Saurí, en posesión de María Díaz, José Avalo Sánchez presentó un pleito para reivindicar la finca Saurí. Se hizo la mensura de la finca Bello Sitio, Saurí incluída, y resultó con una cabida de 415 cuerdas. De suerte que, si se deducían de las 415 cuerdas que tenía todo el terreno incluyendo a Saurí, la finca Bello Sitio que se había hipotecado como de 400 cuerdas, solamente tendría 281. En tales circunstancias, la Corte Suprema de los Estados Unidos resolvió que Avalo Sánchez estaba impedido por sus propios actos de alegar que la finca Saurí no era parte de Bello Sitio y como tal comprendida en la hipoteca, pues él indujo a creer a María Díaz, al hipotecarle una sola extensión de terreno consistente de 400 cuerdas, que todo el terreno incluído dentro de los límites de la finca Bello Sitio le pertenecían. Y fué más claro el fraude al comprobarse que deducida de la finca Bello Sitio el área de Saurí, no estaba Avalo Sánchez hipotecando las 400 cuerdas que describía en la escritura.

En el caso que nos ocupa el error cometido por los demandantes pudo ser fácilmente descubierto por Ortiz Pericchi si hubiera ido al Registro como era su deber.

 Invocan los demandados el artículo 175 del Reglamento para la Ejecución de la Ley Hipotecaria para sostener su contención de *res judicata.* Arguyen que la causa de acción de nulidad establecida por los demandantes en esta acción pudo ser instada por Rafael Arrillaga Urrutia y su esposa dentro del referido procedimiento y que no habiéndolo hecho, Adela Gaztambide que fué parte demandada en el procedimiento ejecutivo, y los demás herederos de Rafael Arrillaga Urrutia, no pueden ahora tratar de litigar esta cuestión que pudieron haber litigado dentro del propio procedimiento ejecutivo. Suponiendo, sin resolverlo, que el procedimiento sumario de la Ley Hipotecaria pudiera constituir *res judicata* en ciertos casos, para resolver el problema bastará examinar el artículo 175 del Reglamento para la Ejecución de la Ley Hipotecaria antes de ser enmendado por la Ley núm. 81 de 13 de mayo de 1936 ((1) pág. 433). Dicho precepto legal, en lo pertinente, dispone:

"Los procedimientos sumarios a que se refiere esta Sección no podrán suspenderse por medio de incidentes ni por otro alguno, a instancia del deudor, del tercer poseedor, ni de ningún otro que se presente como interesado, salvo en los siguientes casos:

"1. Si se justificare documentalmente la existencia de un procedimiento criminal por falsedad de título hipotecario en cuya virtud se proceda, en que se haya admitido querella o dictado auto de procesamiento.

"2. Si se interpusiere una tercería de dominio, acompañando inexcusablemente con ella título de propiedad de la finca de que se trate, inscrito a favor del tercerista con fecha anterior a la inscripción del crédito del ejecutante y no cancelado en el Registro.

"3. Si se presentare certificado del Registrador, expresivo de quedar cancelada la hipoteca en virtud de la cual se proceda, o copia auténtica de la escritura pública de cancelación de la misma, con la nota de presentación en alguno de los Registros en donde se

haya de tomar razón de ella, otorgada por el actor o por sus causantes o causahabientes, acreditándose también documentalmente el título de transmisión en su caso.

"* * * * * * *

"Todas las demás reclamaciones que puedan formular, así el deudor como los terceros poseedores y los demás interesados, incluso las que *versaren sobre nulidad del título o de las actuaciones*, o sobre vencimiento, certeza, extinción o cuantía de la deuda, se ventilarán en el juicio plenario que corresponda, sin producir nunca el efecto de suspender ni entorpecer el procedimiento ejecutivo." (Bastardillas nuestras.)

Si examinamos las alegaciones de la demanda veremos que no están comprendidas dentro de los tres casos que, de acuerdo con el referido artículo 175, permitían al deudor hipotecario intervenir en el procedimiento sumario ejecutivo. Por el contrario, las alegaciones de la demanda demuestran que la acción aquí establecida está comprendida dentro del último párrafo de la cita del artículo 175 que acabamos de hacer.

██ ██ Arguyen los demandados que han adquirido las fincas en cuestión por haberlas poseído por más de diez años ininterrumpidamente, de buena fe, y con justo título. Aceptamos que el demandado Tió Nazario ha poseído ininterrumpidamente y por más de diez años las fincas en controversia. También que las adquirió con justo título, pues la escritura de compraventa del condominio que le vendió Ortiz Pericchi y la otra escritura por la cual compró el condominio de Flores Rodríguez, constituyen justo título, puesto que son suficientes para transmitir la propiedad; pero como ya hemos discutido ampliamente, ni Tió Nazario ni ninguno de los codemandados pueden alegar que han poseído de buena fe, ya que hemos demostrado que todos conocían por el Registro los defectos de que adolecía su título. Siendo ello así, no puede existir la buena fe, requisito indispensable para adquirir por la prescripción de diez años. *Costas* v. *G. Llinás & Co.*, supra. Ambos litigantes dedican gran parte de sus respectivos alegatos a discutir si el pacto de anatocismo es legal

cuando se trata de una transacción de carácter civil como es la de este caso. Toda vez que en la demanda no se alegó ese motivo de nulidad, en apelación no consideraremos cuestiones que no fueron suscitadas en la corte inferior al dictarse la sentencia sumaria.

*Por lo expuesto, somos de opinión que erró la corte inferior al resolver que no existía una controversia genuina de hecho, y por consiguiente, procede revocar la sentencia y devolver el caso para ulteriores procedimientos consistentes con esta opinión.*