La Respetable Logia "Caballeros de Agueynaba", No. 9639, de la Gran Orden Unida de Oddfellows en América, representada por su Noble Grande (Presidente) Miguel Caro, demandante y apelada, *v.* La Respetable Logia "Caballeros de Phidias", representada por su Comendador (Presidente) Elpidio Rivera, demandada y apelante.

No. 6318.—*Sometido:* Abril 17, 1934. *Resuelto:* Septiembre 29, 1934.

*Enrique Báez García,* abogado de la apelante; *Pascasio Fajardo Martínez,* abogado de la apelada.

EL JUEZ PRESIDENTE SEÑOR DEL TORO, emitió la opinión del tribunal.

En el año de 1916 y en la ciudad de Mayagüez se organizó la logia demandante bajo los auspicios de la "Gran Orden Unida de Oddfellows de América". Se le dió el nombre de Respetable Logia "Caballeros de Agueynaba, número 9639."

En agosto 5, 1922, la logia adquirió por compra a Antonio Touzón una casa de mampostería, terrera, situada en la calle Peral de Mayagüez, inscribiéndose la compra en el registro de la propiedad. La logia se instaló en su casa y como resultara pequeña para sus reuniones y trabajos, la agrandó, construyéndole un segundo piso.

El 9 de mayo de 1930 la demandante aperece vendiendo por escritura pública su casa a la demandada y este pleito fué por ella iniciado con el propósito de que la corte declarara nula la escritura, o mejor dicho, el contrato hecho constar en la misma.

Excepcionó y contestó la demandada. Fué el pleito a juicio y la corte dictó sentencia favorable a la demandante, con las costas a la demandada. La demandada interpuso entonces el presente recurso de apelación, señalando en su alegato los siguientes errores cometidos a su juicio por la corte de distrito: 1, al declarar sin lugar su excepción previa; 2, al resolver que el notario que autorizó la escritura estaba incapacitado; 3, al decidir que existió identidad de partes contratantes; 4, al concluir que no medió precio o consideración; 5, al declarar la demanda con lugar, y 6, al imponerle las costas.

En su relación del caso y opinión la corte sentenciadora declaró probadas la existencia de la logia demandante desde 1916, la adquisición por ella de la casa en cuestión y la ampliación de la misma y su dedicación a templo.

También declaró probado que la venta de la casa de la

demandante a la demandada no fué una venta real y efectiva sino hecha con el propósito de que la propiedad no pudiera ser hipotecada y a fin de que la logia demandada constituída por los mismos miembros que formaban la logia demandante pudiera dedicarse a otros trabajos que los reglamentos de la logia demandante no les permitían realizar, y que una vez que la demandada obtuvo el otorgamiento de la escritura, se rebeló contra la Orden Unida de Oddfellows en América y abandonó por completo la logia demandante expulsando a los miembros de ésta que permanecieron fieles a la Orden, apropiándose para su solo uso y beneficio del templo y constituyendo una orden nueva denominada Oddfellows Latinos de América.

Y establecidos esos hechos, llegó la corte a las siguientes conclusiones:

"Que los socios que formaban la Logia demandante con anterioridad a autorizar la formación de la Logia demandada y autorizar igualmente la venta de la descrita propiedad de su pertenencia a la demandada, eran los mismos socios o personas . . . . . y que todos y cada uno de ellos tenían conocimiento de que la escritura de venta en cuestión era una otorgada pro-fórmula, con el solo fin de evitar que la propiedad en litigio fuera gravada y para perpetuar la vida y templo de sesiones de la demandante.

"Que la rebeldía de gran parte de los socios de la demandante después que pasaron a formar la Logia demandada, se llevó a cabo con el preconcebido fin de privar a la demandante de su propiedad . . . . . pues así se desprende claramente del hecho de que . . . . . se rebelaron y abandonaron a la demandante, excluyendo por completo a ésta, y sus socios del derecho que tienen sobre dicha propiedad, a pesar del conocimiento que tenían de que la demandada solamente había sido fundada con el fin de ilustrar y de enseñar a todos los miembros de la demandante, ya que los reglamentos y leyes de la misma no le permitían otras lecturas, cátedras o enseñanzas que las relacionadas con dicha orden demandante.

"Esta Corte igualmente estima . . . . .

"Que no existió consideración alguna en la venta pues esas obligaciones (las mil obligaciones al portador de $5.00) no aparecen otorgadas a favor de la vendedora . . . . . Al vender la en-

tidad demandante la propiedad como tal era la única persona que debió haber recibido el precio o consideración de la venta, pero no sus socios, ni personas desconocidas. La venta con los pagarés a favor de personas desconocidas que pudieran a sus vencimientos ser tenedores y legales portadores de los mismos, equivale al no pago de precio, lo que es contrario a la autoridad que 'para vender' confirió la demandante a sus oficiales.

"Concluye igualmente esta Corte que la escritura en cuestión es nula por el otro fundamento que las mismas personas que formaron la Logia demandante originariamente pasaron a formar a la Logia demandada y habiendo sido la demandante la vendedora y la Logia demandada la compradora la situación de derecho es que existe una identidad de partes, ello es, que no existen las relaciones de dos partes, una que se llame vendedora y otra compradora. No puede concebirse en derecho que una misma persona sea vendedora y compradora al mismo tiempo.

"Concluye igualmente esta Corte que la relacionada escritura era nula por el otro fundamento de que el Notario ante el cual se otorgó estaba imposibilitado de actuar como tal Notario en el otorgamiento de dicha escritura, por cuanto de la prueba se desprende claramente que era parte interesada . . . . . ."

Para formar un concepto más claro de los hechos y de las circunstancias concurrentes, parece conveniente transcribir lo que sigue de la escritura de mayo 9, 1930, y de la declaración del testigo Altieri.

Dice la escritura:

"Por esta escritura, la Respetable Logia Caballeros de Agueynaba, número nueve mil seiscientos treinta y nueve de la Gran Orden de Oddfellows en América, representada por su Digno Noble Grande, (Presidente) el dicho Don Juan Acevedo Pérez vende la descrita finca, con todo lo que a ella corresponde, todo a favor de la representada Respetable Logia, Caballeros de Phydias, por CINCO MIL DOLLARS, que la dicha compradora, por su Comendador (Presidente) Don Elpidio Rivera le entrega en este acto en MIL OBLIGACIONES AL PORTADOR, cada una por el valor de CINCO DOLLARS, pagaderas sin interés alguno el día diez de mayo del año mil novecientos cincuenta; y para responder del pago de todas las mil obligaciones al portador que le entrega, a la persona natural o jurídica que en la dicha fecha del vencimiento sea legal tenedora de todas y cada una de las mencionadas OBLIGACIONES al portador, y de sus

intereses al diez por ciento anual desde la fecha de vencidas hasta su total pago, la compradora Respetable Logia Caballeros de Phydias, representada por su Comendador Don Elpidio Rivera, constituye hipoteca voluntaria sobre la misma propiedad urbana que ha comprado por este documento.''

Y declaró en parte el testigo:

''P.—Usted está relacionado en alguna forma con la Respetable Logia Caballeros de Agueynaba No. 9639?

''R.—Sí, señor; fuí su fundador en Mayagüez hace 16 años.

''P.—Desde que esa Logia se fundó, para qué fines se fundó?

''R.—Se fundó para los fines que determina la Fraternidad entre los hermanos: el seguro mutuo, y visitarse en casos de enfermedad; fundamos un seguro y cualesquiera otras disposiciones que emanen de la Gran Logia del Distrito, y del 'Comité Bienal de Londres.'

''P.—Es decir que no tiene fines lucrativos?

''R.—No, señor.

''P.—Allá por el año 1930, tuvo usted alguna itervención con los miembros de esa Logia?

''R.—La tuve.

''P.—Tenga la bondad de explicarle al Honorable Juez en qué intervino usted.

''R.—El año 1930, en mi carácter de Patriarca de esa Orden, para velar porque no se violasen los principios de la misma—las tenidas tienen que ser terminadas a las diez de la noche, nunca se puede pasar de esa hora—tuve conocimiento por el señor Secretario de esta Honorable Corte, que en mi carácter de Patriarca me llamó la atención de que las tenidas duraban hasta las doce y la una de la mañana.

''Lcdo. Báez García: Me opongo a eso.

''Hon. Juez: Sí.

''Testigo: Bueno. Entonces me informaron los hermanos que no se podía trabajar y yo les manifesté que era falta de escuela, que iba a pensar si podía formar otra Institución dentro de la misma Logia, para que el amigo Arnaldo y el señor Calor Motta fueran los domingos a darles instrucciones; entonces fuí citado por ellos para recibir el consejo mío. Al llegar se me entregó el mallete para presidir, y entonces les dije que había que fundar una Logia, que llamaríamos 'Caballeros de Phydias,' para dedicar la Institución esa a la instrucción, ya que en la Orden no se puede hacer; y a

varios hermanos que desconfiaban que la Logia se iba a vender les dije: 'Bueno, entre ustedes mismos yo les hago una escritura pro-fórmula, que siendo ustedes mismos los Caballeros de Phydias y los Caballeros de Agueynaba, pagarán en mil acciones de $5.00 cada una, y a cada hermano le corresponde la suya, y cada vez que se inicie un hermano, pagará los derechos de iniciación, y además pa-gará una obligación de esas para ser condueños del edificio.' Entonces se reunieron, así lo acordaron, y yo hice la escritura.

"P.—Es ésta la escritura que le pongo de manifiesto?

"R.—Sí, señor, esa misma es, que ellos se reunieron en tenida abierta, y yo concurrí a la Logia y allí le dí lectura a la escritura y les dije: 'Esta es la escritura; ¿todos están conformes?' y unos y otros estuvieron conformes, y delante de mí esa noche la firma-ron."

De todos los errores señalados creemos que el único que se cometió fué el segundo. A nuestro juicio el notario Al-tieri no estaba incapacitado para actuar. El error no lleva consigo, sin embargo, la revocación de la sentencia, porque ésta se sostiene por sus otros fundamentos.

Para impartir justicia en este caso es necesario abar-carlo en su totalidad. Estudiando aisladamente los diferen-tes señalamientos de error que contiene el alegato de la de-mandada apelante, algunas veces nos ha parecido que le asiste por completo la razón, pero al entrelazar todos los he-chos y circunstancias concurrentes, la impresión desaparece y se impone como definitiva la conclusión a que llegara la corte sentenciadora.

Se insiste mucho por la parte apelante en que éste es un caso en que las cortes deben dejar a las partes en la misma situación en que se encuentran por hallarse *"in pari delicto,"* citándose jurisprudencia sobre el particular. Y hay que re-conocer que algo de cierto existe en la contención.

Cuesta casi siempre caro apartarse de la verdad. Lo simulado trae por regla general como consecuencia dificul-tades y complicaciones. Y esto es lo que aquí ha sucedido. No fué sabio el consejo de Altieri ni actuaron bien los que lo si-guieron. Se apartaron de la verdad y se han visto envuel-

tos en dificultades y complicaciones. Pero los hechos mismos demuestran que no fué fraudulento su propósito. Quisieron abarcar más de lo que las reglas de su orden les permitía y conservar para siempre libre su propiedad y han estado a punto de perder ésta y la semilla de la violación de las reglas se extendió más allá de lo que se propusieron. Han sufrido las consecuencias de sus propios actos, pero esas consecuencias no deben extenderse a tanto como si se hubieran puesto de acuerdo para la realización de un delito. Siendo ello así, pudieron invocar, como invocaron y obtuvieron la protección de las cortes a los efectos de que la verdad se restableciera y las cosas volvieran a su propio ser y estado.

Creemos también que asiste la razón a la apelante al afirmar que las mismas personas pueden constituir corporaciones distintas con facultades para contratar entre sí y al sostener que algún valor tienen o pueden tener los bonos al portador que se convino en satisfacer como precio, perc habidos en consideración todos los hechos, antecedentes y circunstancias puestos de manifiesto por la prueba apreciada en conjunto se impone de modo persuasivo al principio y firme después la conclusión de que no hubo en verdad un contrato de compraventa real y efectivo, otorgándose la escritura, como dijo Altieri, ''pro fórmula'' a fin de que las mismas personas pudieran realizar dentro de su propio templo ciertas actividades que deseaban y que las reglas que estaban obligadas a obedecer no les permitían.

De otra suerte es inexplicable que se fijara el precio en la forma en que se hizo. Ningún dinero en efectivo fué entregado. Bonos a vencer a los veinte años sin devengar intereses durante ese período y con la sola garantía de la propia casa vendida fué lo que se entregó.

Suponiendo que la demandante una vez recibidos los bonos los pusiera a la venta en el mercado, ¿qué podría obtener por ellos? No cabe pensar que cinco dólares, ni aun uno, ya que el comprador tendría que entregar el dinero para reintegrarse del mismo después de veinte años sin per-

cibir entretanto beneficio alguno y con el riesgo de que la garantía desapareciera a virtud de incendio, huracán, ciclón o cualquier otra calamidad, o se depreciara por el transcurso del tiempo de tal modo que nada o muy poco llegara a valer cuando fuera a hacer efectiva la garantía. No debe perderse de vista, además, que se dió a la casa el valor de cinco mil dólares y a esa misma suma asciende el montante total de los bonos.

Bajo esas circunstancias, si bien no podría afirmarse en absoluto que los bonos carezcan de algún valor, creemos que puede asegurarse que de hecho no lo tienen y que, por tanto, no medió precio en la transacción.

En cuanto a las costas sólo cabe concluir que son la consecuencia lógica de los hechos probados.

*Debe declararse sin lugar el recurso y confirmarse la sentencia recurrida.*